# IN THE COURT OF APPEALS OF IOWA

No. 24-1227
Filed July 2, 2025

IN RE THE MARRIAGE OF STEPHANIE NIMRICK
AND VICTOR NIMRICK

Upon the Petition of
STEPHANIE NIMRICK, n/k/a STEPHANIE TROUTWINE,
          Petitioner-Appellee,

And Concerning
VICTOR NIMRICK,
          Respondent-Appellant.

_____

          Appeal from the Iowa District Court for Black Hawk County,
Linda M. Fangman, Judge.


          A former spouse appeals from a dissolution decree, challenging various
provisions including a restriction on social-media usage. **AFFIRMED AS
MODIFIED AND REMANDED.**


          Austin J. McMahon of Lange & McMahon, P.L.C., Independence, for
appellant.

          Melissa M. Lien of Ament & Lien Law Firm, P.C., Waterloo, for appellee.


          Considered by Ahlers, P.J., and Badding and Buller, JJ.

**BULLER, Judge.**

Victor Nimrick appeals from a decree dissolving his marriage to Stephanie Nimrick n/k/a Stephanie Troutwine. He contests the decree's protective order restricting his contact with Stephanie, a social-media restriction, the determination placing sole legal custody of three minor children with Stephanie, the physical-care and visitation provisions, the child-support calculation, and the award of attorney fees and related enforcement mechanism. We modify the decree by narrowing the scope of the social-media restriction and affirm all other challenged provisions.

## I. Background Facts and Proceedings

Stephanie and Victor married in 2011 after dating for two years. They moved to Iowa in 2020 or 2021 and separated in late 2022 or early 2023. They share three children: twins born in 2014 and another child born in 2019.

Stephanie petitioned for dissolution in March 2023. Victor evaded and refused service of the petition, and Stephanie had to resort to service by publication. The district court entered a default judgment when Victor failed to appear. Then Victor hired counsel and moved to vacate the default decree about a month later. In an order setting aside the default, the court found that Victor knew Stephanie was seeking a divorce, knew a deputy sheriff had attempted to serve him at his brother's residence, refused to accept formal service at an attorney's office, left Iowa for Illinois, and had not paid any child support while Stephanie was seeking to commence the dissolution proceedings. The court found service by publication "was sufficient" but, because the court was focused on "the best interest of the child," it chose to "err in an abundance of caution and set aside the default decree." The court made an express finding that Victor did

not have "clean hands" and "question[ed] whether this motion to set aside the default decree [was] simply a tool to either harass [Stephanie] or to escape paying child support." And the court ordered Victor to pay Stephanie's attorney fees incurred while she was trying to serve him through the time of the hearing on vacating the default.

A temporary-matters order placed physical care with Stephanie, granted Victor visitation every other weekend and holidays, and granted Stephanie sole legal custody. The order also required Victor to pay child support, which he never did.

Both parties alleged at trial that the other perpetrated violence inside the home. Stephanie detailed multiple instances of domestic violence and sexual abuse. After a sexual assault, Stephanie sought medical care and reported the matter to police. But—according to her—Victor left the area, and police were never able to locate him. Stephanie had also previously obtained a protective order in Illinois as a consequence of domestic violence. Stephanie described one recent occasion in which she and Victor were exchanging the children when Victor grabbed her phone from her hands and threw it "about fifty feet into a field." And she described other occasions in which he was "yelling, screaming," or "jump[ing]" into her vehicle despite her repeatedly telling him he did not have permission to do so.

Victor made various allegations against Stephanie and her family members, none of which the district court appears to have credited. Victor has claimed (on Facebook and otherwise) that Stephanie was violent with him, which Stephanie denies. Victor filed papers with both Illinois and Iowa courts claiming Stephanie

had abused him: he voluntarily dismissed the Illinois action and failed to attend the Iowa hearing, resulting again in dismissal. He also once arranged for Stephanie's arrest in front of the children on allegations that Stephanie maintains were false.

When it comes to the children, Victor often did not provide adequate care during his parenting time under the temporary-matters order, and he frequently left Stephanie in the dark as to the children's whereabouts and activities. As the district court found,

> [T]here's often problems during Victor's visit. Victor does not provide information to Stephanie concerning where the kids are staying, where they're sleeping, or where they're spending their weekends. Up until the trial Stephanie did not know an actual address where Victor was living. She did not know where the children were sleeping. The children have come back after visits starving, saying they have not eaten. In fact, Victor himself had told her at the exchange that the children had not eaten. Stephanie testified the children often have hygiene issues when they return, wearing the same clothes they were sent in on Friday, and they do not appear to have been bathed nor brushed their teeth.

Victor also caused problems with transporting and exchanging the children. In addition to the violence and yelling, Victor's move to Illinois led to extended travel for the children, made more difficult by Victor's lack of cooperation with Stephanie. For example, Stephanie requested to exchange the children at a police department halfway between their homes, but Victor frequently text-messaged her different locations for the exchange at the last minute and would not utilize the police department as neutral ground or exchange the children on time. On one occasion, Victor did not return the children per the terms of the temporary-matters order, which resulted in the children missing school. On another occasion, shortly after exchanging the children, Victor "veer[ed]" his vehicle toward the car containing

Stephanie and the children; the kids "were crying and scared" and "thought [they] were going to go off the road."

Before trial, Victor told Stephanie that he didn't want to work because he "doesn't want to get raped in child support." He was gainfully employed in 2022 (earning approximately $27,000 annually) and 2021 (approximately $25,000). And, in interrogatories, he swore that he "d[id] not claim to be unable to work due to a physical injury or disability." As of trial, Victor claimed to be disabled and unable to work. And he was receiving $1,216 per month as a social security benefit. On cross-examination, he agreed that his alleged disability was the same since approximately 2016 and admitted he could still be working: "I can work, yes, if I try." He also admitted to receiving a lump-sum back payment from the government for more than $16,000 but spent none of it on child support, medical support for the children, or attorney fees the court ordered him to reimburse Stephanie following the default judgment. In a Facebook post, Victor wrote: "I rather give all my money away then [sic] let you even see a penny of it or that bum ass dude you're with." The post included a kissing emoji and a middle-finger emoji.

Before, during, and after the dissolution litigation, Victor harassed Stephanie. According to Stephanie, Victor used "probably 40, 50 different numbers" to send her "threatening or harassing messages" "multiple times a day." Stephanie testified that Victor also harassed her mother (on her personal phone and at her place of work), her brother, and her grandmother. Stephanie submitted text messages and Facebook posts corroborating her account of the harassment.

As the district court put it, "The text messages and Facebook posts are harassing in nature. They are vulgar. They are full of name calling. They clearly

show Victor is unable or unwilling to communicate respectfully with Stephanie." Just by way of illustration, some of the names Victor called Stephanie by text-message include: "druggie azz bitch," "racist white bitch," "rude ass bitch," "hoe ass bitch," "slutt," "whore," "piece of shit," and "dumbass."[1] On one occasion in which both Victor and Stephanie appear to have video-recorded the drop-off, Victor called Stephanie a "stupid ass whore," "fucking delusional," a "bitch," an "asshole," a "ho," a "stupid ass bitch," and a "stupid ass ho" in front of the children, all within thirty seconds. In that video, Stephanie tells Victor to "roll [his] window up" rather than trading insults. She testified this was typical of her interactions with Victor when exchanging the children.

After trial, Victor (seemingly using a fake or falsified number) text-messaged Stephanie:

- "You should feel guilty you stupid fucking whore shits definitely going to get worse for you now";

- "You should stop doing drugs and being a bad Mother piece of shit";

- "Your karma is coming really soon now too you stupid whore"; and

- "You piece of shit you're going to hell for all that you've done"

Victor did not resist Stephanie's motion to reopen the record to include these text messages or otherwise dispute that he sent them. In other messages known to be from Victor's phone number, he called her a "bitch," a "piece of shit," and a

---

[1] We quote Victor's language verbatim in this opinion because he challenges the necessity of the protective order's restriction on his speech. A paraphrase of Victor's derogatory comments would sanitize or minimize the language and its potential impact on Stephanie and the children.

"dumbass," and referred to her "slut ass attorney" and the "bias ass judge that took your side."

Victor's Facebook posts similarly attacked Stephanie and her attorney and accused the district court of being biased. With regard to Stephanie, Victor's posts refer to her as a "narcissist/cheater," a "liar," a "bitch," "grimy," a "manipulator," a "bad mother," and other similar terms. He attempted to enlist his Facebook friends into messaging Stephanie to persuade her to modify her approach to exchanging the children for visitation. He posted: "I don't respect her even as the Mother of my children." And he made posts questioning paternity of two of the children, featuring their photos. Victor admitted on cross-examination that his Facebook page was "public" and "anyone can see it"—potentially including the children. And he admitted that it would be harmful for the children to read at least some of what he posted online.

In addition to the comments targeted at Stephanie, Victor posted on Facebook: "fuck you [middle-finger emoji] and fuck your lawyer." And he called Stephanie's attorney a "stalker" and a "crybaby bitch." Beyond the public Facebook posts, Victor also sent an email directly to Stephanie's attorney, telling her she "should feel ashamed" and calling Stephanie many of the derogatory names he called her in the public communications.

In trial testimony, Stephanie emphasized her view that it was important Victor continue to receive significant parenting time with the children, but she wanted to make time with him less disruptive for the children and involve fewer weekends where the children spent as many as ten hours in the car. In her words, "my goal was to never take the kids away from their dad or take his time away from

the kids." But she did not believe they could share legal custody given Victor's "explosive behavior" and inability to communicate. Victor testified that he thought he and Stephanie were able to positively communicate regarding the children, despite what his attorney characterized as "inappropriate" language, and he said they could function as coparents. Near the end of trial, when the court expressed concern about the burden of travel on the children for visitation, Victor had an outburst in the courtroom that required the court to ask Victor if the court needed to summon security.

The court ordered Stephanie would have sole legal custody of the children, based in part on the court finding Stephanie's reports of domestic abuse were credible and that the abuse happened in the presence of the children. The court also emphasized that "Victor is disrespectful, threatening, vulgar, calls Stephanie names, and cannot participate in making joint decisions due to his behavior." And the court expressly found that "Stephanie's safety w[ould] be jeopardized by . . . joint custody of the children." The court placed physical care with Stephanie for largely the same reasons. And the court ordered that exchanges of children for scheduled visitation with Victor would take place at the Waterloo and Davenport Police Departments and be facilitated by third parties (extended-family members).

In response to an unresisted post-trial motion from Stephanie, the court also incorporated a protective order into the decree, prohibiting Victor from communicating with or being in the physical presence of Stephanie, except during facilitated exchanges. The same provision of the decree imposed a speech restriction: "Victor shall also not post any social media or derogatory comments about Stephanie on any medium." And another provision assessed Victor

approximately $2300 in attorney fees for litigation related to the default and indicated that failure to pay the fees "may result in Victor being held in contempt."

Victor filed a post-ruling motion challenging the visitation schedule, the protective order as unconstitutional, and the attorney-fee provision as unlawfully contemplating contempt as a potential remedy for a future violation.[2] As to the protective order, the court explained its rationale as follows:

> Victor further argues the protective order is unconstitutional because it prohibits communication and contact with [Stephanie] and restricts his ability to post derogatory statements about the victim on social media or any medium. The purpose of a protective order is by nature to restrict a person's ability to contact another person. The protective order prohibiting Victor from contacting Stephanie is not unconstitutional as it was entered after the Court made a finding of domestic abuse and was entered for the protection of Stephanie. As to whether Victor has a constitutional right to post harassing, vulgar, threatening communications, the Court finds he does not have a constitutional right to post threats of violence. Victor does not have a right to harass, insult, or threaten Stephanie. The fact Victor so vehemently argues he has the right to post derogatory, threatening, vulgar messages about Stephanie supports the Court's finding the protective order is necessary.

As for the attorney-fees provision, the court expanded or clarified its earlier ruling, explaining its basis for ordering Victor to pay attorney fees: Stephanie incurred those fees while she was trying to diligently serve Victor and before the court set aside a default at Victor's request so that the court could resolve the issues on the merits rather than close the courthouse doors to Victor. The court also reiterated that Victor had received a lump-sum payment in government benefits and had not

---

[2] Between the decree and the post-trial ruling, Victor repeatedly posted on Facebook that he intended to defy the court order. For example: "I WILL continue to exercise my first 1st amendment e.v.e.r.y s.i.n.g.l.e t.i.m.e. So.. in MY OPINION I think my [babymama], and her attorney are little cry baby bitches." He also tried to pressure Stephanie into ignoring the court's limitations on his visitation.

paid any child support, medical support, or attorney fees from that lump sum—which strongly suggested he had funds available to pay the attorney-fee award to Stephanie.

Victor appeals.

## II.    Standard of Review

Our review in dissolution cases is generally de novo. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). We give weight to the district court's factual findings, particularly regarding the credibility of witnesses, but we are not bound by them. *Id*. To the extent separate constitutional issues are raised, we also review those de novo. *In re Marriage of Seyler*, 559 N.W.2d 7, 8 (Iowa 1997). Questions that turn on the court's statutory authority are reviewed for correction of errors at law. *Id.* And an award of attorney fees is reviewed for abuse of discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006).

## III.    Discussion

We understand Victor to challenge five aspects of the decree: the protective order (including its restrictions on communicating with Stephanie and making derogatory comments about her); legal custody; visitation; child support; and the award of attorney fees and associated enforcement mechanism. We consider each.

### A.  The Protective Order[3]

Victor challenges the protective-order provision in multiple ways, claiming procedural defects; insufficient evidence he perpetrated domestic abuse; a

---

[3] In raising this challenge, Victor's opening brief and reply brief repeatedly refer to district court filings that post-date his notice of appeal. These are outside the

violation of his free-speech rights; and a violation of his rights as a parent. We consider each in turn.

### 1. Procedures

The self-described "threshold contention" of Victor's procedural challenge is his assertion that protective orders cannot be entered in dissolution cases. But this is not accurate. The General Assembly expressly conferred on the district court authority to issue protective orders in chapter-598 cases like this one. Iowa Code § 664A.1(2) (2023) (defining a "protective order" to include "a temporary or permanent protective order . . . under chapter 598"); *id.* § 664A.2(2) ("A protective order issued in a civil proceeding shall be issued pursuant to chapter . . . 598. . . ."); *id.* § 664A.7(1) (setting penalties for the violation of "a protective order issued pursuant to chapter . . . 598"); *see also id.* § 598.42 (requiring the clerk to "provide notice and copies of temporary or permanent protective orders . . . entered pursuant to this chapter to the applicable law enforcement agencies"). And we have expressly upheld such orders before. *See White v. Iowa Dist. Ct.*, No. 11-1831, 2012 WL 1864596, at *4, *7–8 (Iowa Ct. App. May 23, 2012) (affirming a "domestic abuse protective order accompanying dissolution decree").

---

record for purposes of this appeal. *See Alvarez v. IBP, Inc.*, 696 N.W.2d 1, 3 (Iowa 2005) ("[T]he appellate courts cannot consider materials that were not before the district court when that court entered its judgment."); Iowa R. App. P. 6.801 (providing an exclusive list of items comprising the record on appeal). We also note Victor's reply brief attempts to interject counsel's personal recollection of certain events and seeks to vacate an order that post-dates the notice of appeal. We admonish counsel to stop circumventing the rules of appellate procedure. And we note as a general matter that, if we were to consider filings that post-date the notice of appeal in this case, it would not at all benefit Victor.

We reject Victor's claim about the district court's lack of authority as contrary to the plain text of the statute.

Next, Victor argues that the court in this chapter-598 case was required to import the exact procedures of chapter 236. We see no support for this position in the statutory text or our case law. And, in any event, we find that Victor received adequate procedural protections in this case because he had notice and opportunity to be heard. *See Knight v. Knight*, 525 N.W.2d 841, 843 (Iowa 1994) (analyzing procedural due process in the context of domestic-abuse protective orders); *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976) (discussing the federal procedural-due-process framework). Stephanie's pretrial exhibit list included one marked "Sexual Assault Form and Records." And Victor sent Stephanie a text before trial saying "[i]t looks really retarded" for Stephanie to make what he called "false rape allegations." Had the allegations of domestic abuse and sexual violence issue truly been the ambush he now claims, Victor could have asked for a continuance—and he didn't, because he wasn't surprised. In fact, Victor attempted to offer evidence addressing the issue at trial.[4] Consistent with Victor having notice and adequate time to prepare, he text-messaged Stephanie before trial that, if she was trying to prove he raped her, she should "go for it" because he had "all the evidence" he "need[ed] to prove [his] innocence from that serious shit."

---

[4] As Stephanie notes, Victor's appellate brief quotes from an exhibit he proposed on this subject at trial, but the district court excluded that proposed exhibit. The proposed exhibit is not part of our record on appeal. Victor's references to it are improper, and we do not consider them. *See Hill v. State*, No. 22-0653, 2023 WL 2397369, at *3 n.3 (Iowa Ct. App. Mar. 8, 2023). We again admonish counsel not to inject outside-the-record materials into the briefing.

To the extent Victor advances the narrow claim that, while he may have known about the evidence Stephanie intended to offer, he did not know she would be seeking a protective order, we are similarly unpersuaded. Stephanie did not request the protective order until Victor continued to harass her after trial, and he did not resist her motion to reopen the record and offer into evidence those harassing communications. He never sought a continuance or evidentiary hearing. And he only challenged the protective order by a motion to reconsider. Setting aside for a moment concerns about whether this challenge was timely or preserved error, it certainly reflects that Victor had sufficient notice and opportunity to be heard. *See Knight*, 525 N.W.2d at 843. That Victor did not take advantage of the opportunity to be heard does not mean he received inadequate due process. If anything, the court deciding his motion to reconsider gave him an extra opportunity to ensure his claims were heard. We discern no error or legal deficiency.

## 2. Sufficiency of the Evidence

Victor next contends there was insufficient evidence he perpetrated domestic abuse against Stephanie. We disagree. Stephanie testified to multiple instances of domestic (and at least one instance of sexual) abuse, and the district court generally credited her testimony. This was sufficient to support a protective order.

In his brief, Victor describes the district court's ruling as "perfunctory." But it is not. This ruling actually includes quite a bit more detail than the typical form-order issued in a chapter-236 case, which we recognize are often set for short summary hearings and typically include few if any traditional written fact-findings beyond the finding of domestic abuse (and certainly no element-by-element

analysis that Victor suggests must be required).  Victor also writes that it's "inexplicable" how Stephanie could be telling the truth about the abuse when she did not take action to hold him accountable earlier.  But the dynamics of domestic abuse are complicated, and that a victim did not report right away does not mean he or she is lying about the abuse.  *Cf. State v. Taylor*, 689 N.W.2d 116, 125 (Iowa 2004) (discussing the dynamics of domestic abuse and holding that "the defendant's prior conduct directed to the victim of a crime, whether loving or violent, reveals the emotional relationship between the defendant and the victim and is highly probative of the defendant's probable motivation and intent in subsequent situations").

Other scattered complaints appear in Victor's brief on this issue, some of which border on frivolous if not offensive.  For example, he claims that living in Illinois "precludes" him being a "credible and imminent threat" to Stephanie.  This is silly.  Moving across a geographic border does not instantly negate the threat posed by a domestic abuser—particularly one who must necessarily remain connected to the victim through their shared children for more than a decade to come.  And our common sense tells us that a few hours' drive is not much of a barrier to the commission of domestic violence, particularly for an offender with the history of anger, threatening statements, and misogyny consistently demonstrated by Victor—to say nothing of his criminal history, which includes convictions within the last decade for "domestic battery,"[5] harassment, disorderly conduct, and violating a different order of protection.  Victor also complains that Stephanie is not

---

[5] We quote Victor's description of the offense, rather than refer to it with the Iowa term "domestic abuse assault," because it may have been an Illinois conviction.

credible because she did not request "that security be provided at the trial." *See* Iowa Code § 598.8(1). We think most Iowans reasonably believe the courthouse to be a safe place, and there is no legal authority to suggest they must request additional security to pursue a protective order under chapter 598 or seek other relief. In short, none of these complaints persuade us.

Last, Victor attempts to shame Stephanie for allegedly sending him explicit photos. Stephanie maintains Victor "hacked" her phone—a claim at least partially corroborated by multiple messages in which someone, likely Victor using a fake number, admits to doing exactly that. We find this sex-shaming argument from Victor irrelevant, immaterial, and improper.

### 3. Free Speech

Victor also levies a challenge under the state and federal constitutions' free-speech provisions. *See* U.S. Const. amend. I; Iowa Const. art. I, § 7. But it is not entirely clear to us how much of Victor's challenge remains after we have upheld the district court's finding that he domestically abused Stephanie. On a human level, we recognize the district court's speech restriction does not ask much of Victor—just that he treat Stephanie like we expect all citizens to treat one another in civilized society. But, human decency aside, there are constitutional questions in the mix. As a student law review comment puts it, "A seemingly simple clause that asks divorcing parties to act like adults is surprisingly the center of great controversy." Jacob Eisenman, Comment, *The Use of Non-Disparagement Clauses in Family Law Cases*, 33 J. Am. Acad. Matrim. Law. 593, 593 (2021).

Prior restraints on speech are "one of the most extraordinary remedies known to our jurisprudence" and warrant scrutiny. *See Neb. Press Ass'n v. Stuart*,

427 U.S. 539, 562 (1976).[6]  Yet prior restraint can be proper based on "(a) the nature and extent of [the speech being restrained]; (b) whether other measures would be likely to mitigate the effects of [the speech]; and (c) how effectively a [prior restraint] would operate to prevent the threatened danger."  *Id.*

The relevant portion of the decree ordered: "Victor shall also not post any social media or derogatory comments about Stephanie on any medium."  In our review, we discern only one problematic aspect of the order—the decree's reference to "derogatory comments."  In its post-ruling order, the court clarified that the protective order was intended to establish that Victor could not post "threats of violence" or "harass, insult, or threaten Stephanie."  We have little trouble concluding the order's prohibition on threats and criminal harassment withstands constitutional scrutiny, as those restrictions touch only on unprotected speech. *See Wedding v. Harmon*, 492 S.W.3d 150, 155 (Ky. Ct. App. 2016) (upholding restriction on a parent's ability to harass the other parent).  But some of Victor's past and probable future comments may fall outside the categories of utterly unprotected speech and instead in the broader bucket of "derogatory comments." For example, his past social media posts ranged from calling Stephanie a "narcissist/cheater" to "grimy" to a "manipulator" and many other disparaging

---

[6] Because Victor does not advance any argument that the analysis under the Iowa Constitution would differ from its federal counterpart, we find any independent state-constitution claims waived and analyze the issue under federal law.  *See* Iowa R. App. P. 6.903(2)(a)(8)(3) cmt.; *cf. State v. Tyler*, 830 N.W.2d 288, 291–92 (Iowa 2013) ("Because Tyler has not proposed a standard for interpreting our search and seizure provisions under the Iowa Constitution differently from its federal constitutional counterpart, we will apply the general standards as outlined by the United States Supreme Court for addressing a search and seizure challenge under the Iowa Constitution.").

terms. These comments are certainly "derogatory" under a common definition. *See Derogatory*, Merriam-Webster, https://perma.cc/T4WC-YZPX (defining the term as "expressive of a low opinion : disparaging" or "detracting from the character or standing of something"). But the comments are not threats and likely not harassment (at least when considered in isolation).

So, can a court prohibit one parent in a dissolution from making "derogatory" comments about the other? Massachusetts courts have recognized "the State has a compelling interest in protecting children from being exposed to disparagement between their parents," and that a disparagement restriction may be permissible when linked to communication that would impact the children. *Shak v. Shak*, 144 N.E.3d 274, 279 (Mass. 2020) (citation omitted). We agree with this proposition. Following that same rationale, the South Carolina Court of Appeals recently upheld the following provision in a contentious dissolution:

> All parties are restrained against the use of profanity or making any derogatory comments about or toward the other party or allowing anyone to do so in front of the child/children, or in any manner whereby the child might learn of the same, **except where there exists a reasonable expectation of privacy whereby the child reasonably would not, could not, or should not learn of the same.**

*Clark v. Clark*, ___ S.E.2d ___, ___, 2025 WL 699278, at *7 (S.C. Ct. App. 2025). In upholding the provision, the South Carolina court emphasized first that the provision left the parents free to derogate each other in forums where they had a reasonable expectation of privacy and second that sophisticated children are apt to access public internet posts made by their parents. *Id.* at *7–8. We find both of these considerations persuasive.

With this backdrop in mind, we think the protective order entered by the district court here generally withstands constitutional scrutiny but could be more narrowly tailored to ensure Victor retains a forum in which he can express derogatory comments about Stephanie if there is no reasonable probability the children will be exposed to or otherwise affected by the comments. To effectuate that holding, we affirm the social-media restriction in the decree as modified, and we direct the district court on remand to substitute the existing one-sentence speech restriction prohibiting derogatory comments on "any social media" or "any medium" with a separate order containing the following provisions or the substantial equivalent:

> Victor shall not post on social media or any other forum any messages that constitute harassment or threats toward Stephanie. And Victor shall not make derogatory comments about Stephanie in front of the minor children or in any medium in which the minor children are reasonably likely to become aware of Victor's derogatory statements.

We believe this re-tooling of the decree's speech restriction addresses the Facebook posts, text messages, and in-person comments that prompted the court to issue the order while appropriately balancing Stephanie and the children's interests as well as Victor's free-speech rights. *Cf. id.* at *7; *see also In re Marriage of Hartmann*, 111 Cal. Rptr. 3d 242, 245 (Ct. App. 2010) ("[C]ourts routinely order the parties not to make disparaging comments about the other parent to their children or in their children's presence."). However, nothing about our opinion affirming the provision as modified or the accompanying remand is intended to prohibit the district court from, in its discretion, hearing additional evidence and further refining the protective order (in compliance with the state and federal

constitutions, case law, and other applicable legal authority) to address any additional post-decree conduct or statements by Victor that we were unable to address in this opinion given the scope of the existing record.

### 4. Vagueness

Victor also alleges the speech restriction is impermissibly vague under the state and federal constitutions. We are not persuaded. As we identified above, "derogatory" has a commonly understood definition, and there are easily identifiable examples of Victor's speech in this record that fall in the scope of that definition. As modified above, the speech restriction set forth is not void for vagueness. Victor has not proven the restriction fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, nor do we discern a danger of arbitrary and discriminatory enforcement. *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (explaining the void-for-vagueness doctrine). And we are not concerned the provision sweeps up protected speech given our narrowing of its application. *See id.*

### 5. Parental Rights

Victor next contends the protective order's communication restriction "unduly and substantially burdens [his] constitutional rights as a parent and his fundamental interests in familial integrity and association under both the Iowa and United States Constitutions." But Victor cites no legal authority—and we are aware of none—holding that a father has a constitutional right to communicate with (or insult and disparage) a mother after domestically abusing her. In our review, we discern no constitutional basis for such a holding and reject the argument. To the extent Victor claims the restriction on communicating with Stephanie may impact

his ability to exchange the children, we think the district court's involvement of third parties is neither particularly unusual nor improper. And it certainly is not unconstitutional on these facts. If the involvement of third parties proves unworkable, Victor can seek relief from the district court and develop a factual record with specifics on why it is unworkable. Until then, we discern no basis for disturbing the decree beyond the modification set forth above.

### B. Legal Custody

Victor also challenges whether the district court should have awarded Stephanie sole legal custody of the children. He did not seek below, nor does he seek on appeal, physical care of the children.

In dissolving a marriage with minor children, the district court must assign sole or joint legal custody. *In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009). "Legal custody" grants the parent (or parents) certain rights and responsibilities, including but not limited to "decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(5); *see also Gensley*, 777 N.W.2d at 714. The child's best interests are the primary consideration. Iowa R. App. P. 6.904(3)(n). And the district court should, if reasonable and in those best interests, ensure the children have maximum physical and emotional contact with both parents. Iowa Code § 598.41(1)(a). The Iowa Code and our case law set forth a lengthy list of non-exclusive factors to guide custody decisions. *Id.* § 598.41(3); *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) (listing often-overlapping considerations for evaluating legal custody and physical care).

Among the statutory factors, the district court must consider "[w]hether a history of domestic abuse . . . exists." Iowa Code § 598.41(3)(j). The court must weigh the surrounding facts and circumstances, including whether a petition for relief was filed, whether a protective order was entered, the response of peace officers to the scene of any alleged abuse, and whether an arrest or conviction resulted. *Id.* "[I]f the court finds that a history of domestic abuse exists, a rebuttable presumption against the awarding of joint custody exists." *Id.* § 598.41(1)(b).

Here, the district court explicitly found a history of domestic abuse, and that finding was grounded in credibility findings we give weight to on appeal. *See* Iowa R. App. P. 6.904(3)(g). Victor thus faces the uphill climb of not only disturbing credibility findings but also rebutting the presumption against joint legal custody. *See* Iowa Code § 598.41(1)(b). As we understand his challenge, he essentially argues that he never physically harmed the children, that the communication problems between him and Stephanie weren't that bad, and that Stephanie "would be glad to share" medical and education records with Victor. While it is true the record does not prove Victor ever physically harmed the children, his disparaging and harassing conduct toward Stephanie certainly was not in the children's best interests, especially when committed in their presence. The record is replete with evidence that the acrimony between these parties goes well beyond the normal discord attendant to separating couples, as evidenced by the many issues that arose while the parties operated under the temporary-matters order. We find Victor's behavior during that time demonstrates he cannot co-parent. And we find much of his appellate argument on this point belied by the record: for example, he

argues the parties "were able to agree on exchange points" to hand off the children, yet the district court actually found that instances of domestic violence occurred during the exchanges and that Victor had "made the exchanges difficult" in part by refusing to agree on a neutral site like the police station. We agree with the district court on our de novo review, particularly given the vitriol Victor spewed during the recorded exchange in which he called Stephanie the many names and epithets we set forth in the facts section of this opinion, all with the children in earshot.

We also, like the district court, recognize Stephanie's past and professed future intent to support Victor's relationship with the children despite his abusive conduct toward her. And we agree with the district court Victor has shown he "cannot support Stephanie's relationship with the children." This too supports placing sole legal custody with Stephanie. And we broadly agree with the district court's observation that the approximately six-hour drivetime between the parents also weighs against joint legal custody, given the parents' inability to communicate (and in light of Victor's inability to co-parent, abide by court orders, or respectfully communicate with Stephanie). In sum, the factual record in this case supports the district court's conclusion that joint legal custody was unworkable and not in the children's best interests. *See id.* § 598.41(2)(b).

At one point, Victor seems to argue in his appellate brief that the district court must have credited his allegations that Stephanie domestically abused him because the court noted in its ruling he made such allegations. We do not agree. The district court specifically found "Stephanie's safety will be jeopardized by awarded joint custody of the children." This necessarily credits her version of events. As does entering the protective order, which the court noted was after it

"made a finding of domestic abuse" and done "for the protection of Stephanie." We discern no error in the court's application of the rebuttable presumption against joint custody after a finding of domestic violence. *See id.* § 598.41(1)(b). The district court correctly granted Stephanie sole legal custody.

## C. Visitation

Victor levels a somewhat ambiguous challenge to the visitation provisions, contending they are "unconstitutional and/or otherwise not in the best interests of the children." Although we are not sure the exact contours of this claim, we do our best to address the arguments as we understand them.

Victor first mischaracterizes the district court order, claiming on appeal that the district court restricted his visitation as punishment for his failure to pay child support. That is not true. The district court instead reasonably noted that requiring Stephanie to bear the financial costs of transporting the children to Victor was unreasonable when she was getting "no support" from Victor. In other words, the court found failure to pay child support was relevant to transportation for visitation, rather than the exercise of visitation. We agree with the district court and discern no error in that analysis.

Victor goes on to contend that requiring school-year visitation take place in Iowa violated his rights as a parent under the state and federal constitutions. Much like his earlier parental-rights argument regarding the protective order, he cites no case law or other legal authority that supports his position that requiring visitation in the children's state of residence is unconstitutional. And, contrary to Victor's protest that there is no reason to require visitation in Iowa, we find Victor's own conduct during visits—lying or obfuscating about the children's whereabouts,

frustrating or impeding exchanges, threatening Stephanie, causing the children to miss school, and more—weighs heavily in favor of the geographic restriction. As does the district court's expressed concern that the children had been spending more than ten hours per weekend in a car during the school year while Victor engaged in various shenanigans while the temporary-matters order was in place.[7] This geographic restriction furthers the children's best interests and, to the extent it touches on Victor's constitutional rights as a parent, it does not infringe upon them.

The remainder of Victor's argument on this issue is even harder to decipher in the briefing, but he seems to argue he should have received more visitation. We are not inclined to tinker with the district court's thoughtful assessment of the visitation calendar given the geographic distance between the parties. Victor has advanced little more than disagreement with the court on this point, and it suffices to say for purposes of our review that the considerations we have identified elsewhere in this opinion all support that the existing visitation schedule is lawful and in the children's best interests.

### D. Child Support

Victor also challenges the district court's child-support calculation, asserting the court erred in imputing income to him based on his 2022 tax return. Victor admits he responded to an interrogatory by writing that he was not disabled but

---

[7] At trial, the district court expressed concern that it had been misled by Victor about his whereabouts when entering the temporary-matters order. The court emphasized it "would never have ordered every-other-weekend visitation for children this young and expect them to spend ten hours every other weekend or twenty hours a month to go to visits."

now claims that he misunderstood the question as only concerning physical disability, while his alleged inability to work is due to "mental or psychological disabilities." We are skeptical of this invented explanation, offered for the first time on appeal. And we give it little weight, particularly in comparison to the district court's fact- and credibility-findings adverse to Victor, as well as the record evidence that Victor (during the time period he claimed to be disabled) has held multiple positions at a meatpacking plant and bottling companies. In his own words, Victor "can work" if he "tr[ies]." The district court was authorized to impute income to Victor under Iowa Court Rule 9.11(4) and made a written finding to that effect. It was reasonable to rely on Victor's 2022 tax return as a basis for that finding.

Related or perhaps embedded within this challenge is Victor's argument that there was an error in distributing certain social-security payments to the children due to paperwork problems and that this should have been accounted for in assessing child support. *See* Iowa Code § 598.22C. The problem for Victor is that he did not present any evidence on this subject at trial. The district court noted this in a ruling on Victor's post-trial motion, observing the court "cannot possibly" have erred when Victor did not provide the court with any of this information. We agree. And we find the record as currently developed insufficient to provide Victor any relief on the child-support calculation. We reject his claim on appeal, though without prejudice to any relief he may seek from the district court in the future, given the recognition in the court's post-trial ruling that information provided by Victor in the future "may decrease [his] out-of-pocket payment because he will be credited for any payments made by Social Security" and the court's directions to

Victor to provide the court with that information "so an appropriate order may be entered." We decline to weigh in further on this potential future issue.

### E. Attorney Fees and Contempt

Victor last contends the district court abused its discretion in ordering him to pay attorney fees and informing him that failure to comply may result in contempt proceedings. He claims in his brief that the fees "were not imposed pursuant to any statute or rule." But the district court specifically identified Iowa Code section 598.10(1)(a) as the statutory authority it relied on and explained its reasoning in detail. The record as a whole is replete with testimony and other evidence about the parties' needs and financial resources. And we discern no abuse of discretion in the court considering relevant equities in assessing fees pursuant to its statutory authority. *See Sullins*, 715 N.W.2d at 255.

Victor goes on to claim that informing him that failure to pay fees could serve as the basis for contempt proceedings violates the Iowa Constitution's prohibition on incarceration for civil debts. *See* Iowa Const. art. I, § 19. It's not clear to us Victor preserved error on this claim below, as we discern no ruling on it. Regardless, the claim is premature and not yet ripe for our review. Whether Victor will be held in contempt for failing to pay his attorney fees is a hypothetical or speculative future concern, and we are not empowered to weigh in on those. *See, e.g.*, *State v. Iowa Dist. Ct.*, 616 N.W.2d 575, 578 (Iowa 2000) ("A case is ripe for adjudication when it presents an actual, present controversy, as opposed to one that is merely hypothetical or speculative."). To the extent any issue related to the court mentioning its enforcement mechanism is before us at this time, we discern no error. *See* Iowa Code § 598.23(1) (authorizing contempt as the mechanism to

enforce domestic-relations decrees and establishing willful disobedience as contemptuous conduct).

## IV.     Disposition

We affirm the speech limitation in the decree as modified, as discussed in Division III.A.3 of this opinion.  We remand with directions for the district court to enter an order consistent with that holding.  And we otherwise affirm the decree in its entirety.

**AFFIRMED AS MODIFIED AND REMANDED.**